IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JAMAL MALONE, | ) | CASE NO. 1:16 CV 1993 |
| | ) | |
| Petitioner, | ) | JUDGE JEFFREY J. HELMICK |
| | ) | MAGISTRATE JUDGE DAVID A. RUIZ |
| v. | ) | |
| | ) | |
| ALAN LAZAROFF, Warden, | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| Respondent. | ) | |

## I.    INTRODUCTION

Petitioner Jamal Malone, a prisoner in state custody, has filed in this Court a *pro se*

petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging the constitutionality

of his convictions and sentences in *State v. Malone*, Case No. CR 13- 577833.    (R. 1.)

Respondent Warden Alan Lazaroff[1]  has filed a return of writ.    (R. 15.)    Malone has filed a

traverse and amended traverse.    (R. 22, 27.)

This matter is before the undersigned by an automatic order of reference under Local

Rule 72.2 for preparation of a report and recommendation on Malone's petition.[2]    For the

reasons stated below, the court recommends Malone's petition be DISMISSED.

---

[1]  Alan Lazaroff is the warden of the Mansfield Correctional Institution in Mansfield, Ohio, where
Malone is incarcerated.    (R. 15 at 1.)

[2]  This case was transferred to the undersigned following the retirement of Magistrate Judge
Kenneth S. McHargh.

## II.  FACTUAL BACKGROUND

Ohio's Eighth District Court of Appeals set forth the following facts underlying Malone's

convictions:

{¶ 4} In the evening hours of July 2, 2012, [27-year-old Kishaun] Stratford was shot and killed near his apartment located at 6110 Denison Avenue in Cleveland, Ohio. Through their investigation, Cleveland police learned that Malone and [co-defendant Darnell] Holloway were involved in Stratford's death. Malone desired to kill Stratford because of an incident that occurred during the late evening hours of June 30, 2012, at a house on West 31st Street owned by Stratford's cousins, Harold Moore ("Moore") and Martez Robertson ("Robertson"). Stratford and others would record rap music in Moore's homemade studio. While sitting on the front porch of Moore and Robertson's house, waiting to use Moore's studio, Malone was robbed by two assailants. One of the assailants tried to disguise his voice, which led Malone to believe this assailant was Stratford.

{¶ 5} Asa Prude ("Prude"), Malone's cousin, was on his way to Moore's studio when Malone was robbed. Prude was also a longtime friend of Stratford. When he arrived at Moore's house, he observed Malone sitting on the porch with a towel covering his mouth. Malone was bleeding, and a tooth was knocked out of his mouth. At that time, Malone told Prude that he believed Stratford was one of the assailants who mugged him. Before he went to the hospital for his injuries, Malone asked Prude to call "Chill," a.k.a. David Cousin ("Cousin"), and ask him if he had seen Stratford because Malone wanted to finish working on a song together. Approximately five minutes after speaking with Prude, Cousin received a call from Malone asking if he had seen Stratford lately. Cousin testified that he thought that both calls were "odd," given that he never observed Malone and Stratford record together. Nevertheless, Cousin testified that he provided Prude with Stratford's phone number and subsequently told Stratford that Malone and Prude were trying to contact him.

{¶ 6} Then, at approximately 6:30 p.m. on July 2, 2012, Stratford left the apartment he shared with his girlfriend, Amada Gamez ("Gamez"), and rode his bicycle to his cousins' house on West 31st Street. After spending approximately 30 minutes in the studio, Stratford rode his bike back to his apartment on Denison Avenue. At some point, Stratford decided to stop at the corner gas station to purchase a cigar.

{¶ 7} While riding to get the cigar, Stratford called Cousin at approximately 7:35 p.m. on his cell phone. While talking to Cousin, Stratford noticed a car parked on the street near Partner's Pub, a bar located across from Stratford's apartment. Cousin testified that Stratford stated, "that look like Mal. That is Mal. Let me go holler at him." Cousin explained that "Mal" is Malone's nickname. Cousin then heard wind

picking up in the phone and assumed Stratford was approaching "Mal." Stratford told Cousin that he would call him back and ended their call at 7:47 p.m. Approximately seven minutes later, Cousin received a call from Gamez who informed him that Stratford had been shot.

{¶ 8} Surveillance video from Partner's Pub, which was played for the jury, depicts Stratford riding his bicycle up to a white Chevy Impala, later determined to be Malone's vehicle. He parked his bicycle and approached the driver, later determined to be Malone. While Stratford spoke with Malone, the video depicts a man, later identified as Holloway, run up behind Stratford and fire his gun into Stratford's back. Holloway then jumped into the passenger side of the vehicle, and Malone drove away from the scene. After being shot, Stratford stumbled and fell onto a tree lawn on West 62nd Street.

{¶ 9} Richard Nesmith ("Nesmith"), a resident in the area, was in his driveway washing his car when he observed an argument between a young black man on a bicycle, later determined to be Stratford, and people inside a white car. He did not pay much attention to this argument because it was near a local bar, and it was normal to hear arguing. He first heard what he thought were fireworks and then heard a woman screaming. He ran to the end of the driveway and observed the white car, later determined to be Malone's Chevy Impala, as it sped away and saw Stratford stumble across the street and fall against a wall. When he ran up to Stratford, Barbara Lydston ("Lydston"), Stratford's neighbor, was already on the scene. Nesmith knows Lydston from the local neighborhood bar. Nesmith held Stratford's head up and told him he was "going to be all right." He testified that Stratford was in shock. He was bleeding, his eyes were glazed, and he could barely speak.

{¶ 10} Lydston testified that she was outside her apartment when she heard gunshots. She then ran across the street and found Stratford lying face down with bullet holes in his back and buttocks. Lydston, a home health care provider, attempted to assist Stratford by taking the T-shirt from his shorts pocket and using it to apply pressure to the gunshot wounds. Lydston testified that Stratford was losing blood and was barely breathing. He could not move his head and was mumbling. Lydston asked him, "who did this?" Stratford responded by repeatedly saying "Mal." After naming "Mal," Stratford lost consciousness, and Lydston began administering CPR.

{¶ 11} Later that evening, Lydston was interviewed by Cleveland police detectives who were being followed by cameramen for the television show, The First 48. Lydston testified that the cameramen's presence "bothered" her because she was scared for her safety and possible retaliation for publicly cooperating with the police. Due to this fear, Lydston admitted that she withheld information from the

3

police, including Stratford's dying declaration that "Mal" was responsible for his death.

{¶ 12} Months later, Lydston was reinterviewed by detectives. During this interview, Lydston provided detectives with all relevant information, including Stratford's dying declaration and the fact that she had seen Malone in a white Chevy Impala "several times" on the day of Stratford's murder. Significantly, Lydston testified that, at approximately 5:30 p.m. on the day of Stratford's murder, she observed Stratford speaking with Malone as he sat inside his white Chevy Impala. Lydston stated that they were "either arguing or speaking loudly in the parking lot."

{¶ 13} Gamez also arrived on the scene. Gamez was home at the time of the shooting and heard the gunshots at the same time as Nesmith and Lydston, but she initially thought it was fireworks. Gamez's neighbor informed her that Stratford had been shot, and Gamez rushed over to find Lydston administering CPR to Stratford.

{¶ 14} Paramedics and Cleveland police officers arrived on the scene. The paramedics transported Stratford to MetroHealth Hospital where he was pronounced dead. Officers on the scene learned that a white or gray, early 2000 model Chevy Impala was used in the murder. Homicide Detective Ignatius Sowa ("Sowa"), a 33-year veteran of the Cleveland Police Department, investigated the matter. He interviewed numerous witnesses, including Lydston, who mentioned someone named "Mal" as a suspect. He also interviewed Cousin, Robertson, and Moore, all who mentioned "Mal" and another man named "Aces" as suspects. Sowa later learned that "Mal" was Malone and "Aces" was Prude. Sowa also learned that a 2002 white Chevy Impala was registered to Malone.

{¶ 15} Sowa continued to investigate Stratford's murder through the summer and early fall of 2012, focusing on locating Malone, Prude, and the Chevy Impala. In October 2012, Sowa discovered that the title to that Impala had been transferred to Jontay Noles ("Noles"). Sowa contacted Noles and advised her that her car was the subject of a murder investigation. After obtaining consent from Noles, police searched the car and determined that there was a defect on the driver's side door consistent with it being hit by a bullet. The police also determined that the driver's side interior panel had been previously removed and reattached and the plastic foam beneath the previously removed interior panel had been disrupted.

{¶ 16} In November 2012, Malone was arrested on unrelated charges. When arrested, police discovered five different prescription pill bottles, with all five prescriptions made out to Holloway. Holloway was later arrested on unrelated charges in January 2013.

4

{¶ 17} The next major step in the investigation took place in December 2012, when Sowa re-interviewed Robertson and showed him the surveillance video. Robertson identified the car in the video as Malone's white Chevy Impala. However, Robertson was unable to identify the shooter.

{¶ 18} The investigation then stagnated until May 2013, when two key developments occurred. First, police located and interviewed Prude, who agreed to cooperate in exchange for consideration from the prosecutor's office in an unrelated case. Prude was interviewed by detectives in May 2013 and again in June 2013. During these interviews, Prude was shown the surveillance videos by Detective Carl Bowers, who served as a blind administrator. While watching the videos, Prude identified Stratford as the victim, Holloway as the shooter, and Malone's Chevy Impala as the car used in the murder.

{¶ 19} Second, John Young ("Young") became Holloway's cellmate in Cuyahoga County Jail. After Holloway learned that he was being investigated in connection with a murder following Prude's viewing of the surveillance tape, Holloway discussed the murder with Young. Young testified that Holloway admitted that he was compensated for his role as the shooter, that there was a clear motive for the murder, and that the other individual involved in the murder was in prison.[3]

{¶ 20} In June 2013, Sowa interviewed Holloway as a suspect in Stratford's murder. During this interview, Holloway repeatedly told Sowa that he did not know Malone, despite the fact that Malone and Holloway are cousins and Holloway's prescriptions were found on Malone when he was arrested in November 2012. Following the interview with Sowa, Holloway became more concerned about being implicated in Stratford's murder and admitted to Young that he was the person who shot Stratford in exchange for $3,500 and a pound of marijuana.

{¶ 21} Young was not the only person that Holloway confided to while in the Cuyahoga County Jail. Rodell Smith ("Smith") was placed in Holloway's pod in June 2013. Holloway was friends with Smith's brother. Holloway began discussing with Smith details of a murder case he was concerned about. Holloway told Smith that he was present for the murder and that a car was involved in the murder. Smith testified that he witnessed a conversation between Holloway and Malone in the recreation area of the county jail.

*State v. Malone*, No. 101305, 2015 WL 3540457, at *1-4 (Ohio Ct. App. June 4, 2015).

---

[3] Prior to Young's testimony, that [sic] the trial court limited Young's testimony to Holloway's involvement in Stratford's murder and specifically ordered Young to make no mention of Malone during his testimony.

These facts "shall be presumed to be correct," and Malone has the burden of rebutting the presumption of correctness by clear and convincing evidence.   28 U.S.C. § 2254(e)(1); *Warren v. Smith*, 161 F.3d 360-61 (6th Cir. 1998).

### III.   PROCEDURAL BACKGROUND

#### A.   Trial Court

On September 11, 2013, the Cuyahoga County Grand Jury indicted Malone and co-defendant Holloway on the following charges: one count of aggravated murder in violation of Ohio Rev. Code § 2903.01(A) (Count One); one count of murder in violation of Ohio Rev. Code § 2903.02(B) (Count Two); one count of felonious assault in violation of Ohio Rev. Code § 2903.11(A)(1) (Count Three); one count of kidnapping in violation of Ohio Rev. Code § 2905.01(A)(3) (Count Four); one count of discharge of a firearm on or near a prohibited premises in violation of Ohio Rev. Code § 2923.162(A)(3) (Count Five); one count of having weapons while under disability in violation of Ohio Rev. Code § 2923.13(A)(2) (Count Six); and one count of having weapons while under disability in violation of Ohio Rev. Code § 2923.13(A)(3) (Count Seven).   (R. 15-1, Ex. 1.)   Counts One through Five each included one- and three-year firearm specifications.   (R. 15-1, Ex. 1.)   Malone entered pleas of not guilty to all charges.   (R. 15-1, Ex. 3.)

On February 24, 2014, Malone waived his right to a jury trial as to Count Seven only. (R. 15-1, Ex. 4.)   That same day, the case proceeded to a jury trial.   (R. 21-1 at 2.)   At the conclusion of the State's case, the trial court granted Malone's and Holloway's motions for directed verdict as to the kidnapping charge in Count Four, but denied it as to the remaining counts.   (R. 21-10 at 23.)   On March 7, 2014, the jury returned its verdict, finding Malone and

Holloway guilty of all remaining charges.   (R. 15-1, Ex. 6.)   The trial court also found him
guilty of having weapons while under disability in Count Seven.   (R. 15-1, Ex. 6.)

On April 10, 2014, the trial court held a sentencing hearing.   (R. 15-1, Ex. 7.)   It
merged the charges of aggravated murder, murder, felonious assault, and discharge of firearm
near prohibited premises, as well as the one-year firearm specification with the three-year
firearm specifications on all counts.   (R. 15-1, Ex. 7.)   The trial court sentenced Malone to life
in prison for aggravated murder, with parole eligibility after thirty years, and three years in
prison for the firearm specification, with both sentences to be served consecutively.   (R. 15-1,
Ex. 7.)   The trial court also imposed a twelve–month prison sentence for having a weapon while
under disability, which was to run concurrently with the life sentence, for an aggregate sentence
of thirty-three years to life in prison.   (R. 15-1, Ex. 7.)

### B.   Direct Appeal

Malone, through new counsel, filed a timely notice of appeal to the Eighth District Court
of Appeals.   (R. 15-1, Ex. 8.)   In his appellate brief, he raised the following assignments of error:

1.   The Appellant's convictions are against the weight of the evidence.

2.   The evidence was insufficient to convict the Defendant of aggravated
murder and felonious assault.

3.   The trial court erred by failing to give an instruction on informant testimony.

4.   The Defendant was denied his right to a fair trial and due process of law
because the trial court failed to grant a separate trial.

5.   The trial court erred by failing to give a correct accomplice testimony jury
instruction, R.C. 2923.03(D).

6.   The trial court erred by failing to properly instruct the jury.

7.   The trial court erred by failing to grant a mistrial.

7

(R. 15-1, Ex. 9 (capitalization altered).)    The State filed a brief in response.    (R. 15-1, Ex. 10.)

On June 4, 2015, the Ohio appellate court affirmed the trial court's judgment.    (R. 15-1, Ex. 12.)    Malone, acting *pro se*, moved for reconsideration.    (R. 15-1, Ex. 13.)    The court of appeals denied the motion.    (R. 15-1, Ex. 14.)

Malone, again through new counsel, filed a timely notice of appeal of the appellate court's judgment to the Ohio Supreme Court.    (R. 15-1, Ex. 15.)    In his memorandum in support of jurisdiction, he set forth the following propositions of law:

1.    When a witness testifies in exchange for a benefit provided by the State, a trial court must provide the following cautionary instruction:

> You must consider some witnesses' testimony with more caution than others.  For example, paid informants, witnesses who have been promised immunity from prosecution, or witnesses who have received, or hope to gain, more favorable treatment in their own cases, may have a reason to make a false statement in order to strike a good bargain with the Government.

> The testimony of such witnesses does not become inadmissible because of their moral turpitude or self-interest, but the benefits obtained by the witnesses may affect their credibility and makes their testimony subject to grave suspicion, and requires that it be weighed with great caution.

2.    A trial court errs in failing to grant the defendant a separate trial from his co-defendant when a joint trial will result in otherwise inadmissible evidence being presented to the jury.

3.    The state fails to present legally sufficient evidence of identity when there is no physical evidence and no eyewitnesses tying the defendant to the crime and when the circumstantial evidence implicates other suspects as well as the defendant.

(R. 15-1, Ex. 16.)

8

The Ohio Supreme Court declined jurisdiction over the appeal on December 16, 2015.

(R. 15-1, Exh. 17.)

## IV.   FEDERAL HABEAS CORPUS

Malone filed the *pro se* petition for writ of habeas corpus now before this Court on

August 10, 2016.   (R. 1.)   He asserts the following three grounds for relief:

1.   When a witness testifies in exchange for a benefit provided by the state, a trial court must provide the following cautionary instruction:

> You must consider some witnesses [*sic*] testimony with more caution than others.  For example, paid informants, witnesses who have been promised immunity from prosecution, or witnesses who have received, or hope to gain, more favorable treatment in their own cases, may have a reason to make a false statement in order to strike a good bargain with the Government.
>
> The testimony of such witnesses does not become inadmissible because of their moral turpitude or self-interest, but the benefits obtained by the witnesses may affect their credibility and make[s] their testimony subject to grave suspicion, and requires that it be weighed with great caution.

2.   A trial court errs in failing to grant the defendant a separate trial from his co-defendant when a joint trial will result in otherwise inadmissible evidence being presented to the jury.

3.   The state fails to present legally sufficient evidence of identity when there is no physical evidence and no eye witnesses tying the defendant to the crime and when the circumstantial evidence implicates other suspects as well as the defendant.

(R. 1-1 at 2-3 (capitalization altered).)   Malone filed a motion for appointment of counsel on

January 30, 2017 (R. 11), which this court denied on February 9, 2017 (R. 12).

9

Respondent filed a return of writ on February 14, 2017.   (R. 15.)   Malone filed a motion to strike the return of writ on March 2, 2017 (R. 18), which the court denied on March 10, 2017 (R. 20).   He filed traverse on April 10, 2017 (R. 22), and with permission from the court, an amended traverse on July 17, 2017 (R. 27).   Malone filed a motion for leave to correct the record on June 23, 2017 (R. 26), which the court denied on September 27, 2017 (R. 29).

## V.   STANDARDS OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs Malone's petition for writ of habeas corpus.   *Lindh v. Murphy*, 521 U.S. 320, 336 (1997); *Murphy v. Ohio*, 551 F.3d 485, 493 (6th Cir. 2009).   AEDPA, which amended 28 U.S.C. § 2254, was enacted "to reduce delays in the execution of state and federal criminal sentences, particularly in capital cases, and 'to further the principles of comity, finality, and federalism.'" *Woodford v. Garceau*, 538 U.S. 202, 206 (2003) (quoting *(Michael) Williams v. Taylor*, 529 U.S. 420, 436 (2000)).   The Act "recognizes a foundational principle of our federal system:   State courts are adequate forums for the vindication of federal rights."   *Burt v. Titlow*, 134 S. Ct. 10, 15 (2013).   It therefore "erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court."   *Id.*

One of AEDPA's most significant limitations on district courts' authority to grant writs of habeas corpus is found in § 2254(d).   That provision forbids a federal court from granting habeas relief with respect to a "claim that was adjudicated on the merits in State court proceedings" unless the state-court decision either:

1.   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

10

2.      resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Habeas courts review the "last *explained* state-court judgment" on the federal claim at issue.  *Ylst v. Nunnemaker*, 501 U.S. 797, 805 (1991) (emphasis original).   A state court has adjudicated a claim "on the merits," and AEDPA deference applies, regardless of whether the state court provided little or no reasoning at all for its decision.   *Harrington v. Richter*, 562 U.S. 86, 99 (2011).

"Clearly established Federal law" for purposes of § 2254(d)(1) "is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision."  *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003).   It includes "only the holdings, as opposed to the dicta, of [Supreme Court] decisions."  *White v. Woodall*, 134 S. Ct. 1697, 1702 (2014) (internal quotation marks and citations omitted).   The state-court decision need not refer to relevant Supreme Court cases or even demonstrate an awareness of them; it is sufficient that the result and reasoning are consistent with Supreme Court precedent.   *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam).   And a state court does not act contrary to clearly established law when the precedent of the Supreme Court is ambiguous or nonexistent.   *See, e.g., Mitchell v. Esparza*, 540 U.S. 12, 17 (2003) (per curiam).

A state-court decision is contrary to "clearly established Federal law" under § 2254(d)(1) only "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts."  *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000).

11

And "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

A state-court decision is an "unreasonable determination of the facts" under § 2254(d)(2) only if the court made a "clear factual error." *Wiggins v. Smith*, 539 U.S. 510, 528-29 (2003). The petitioner bears the burden of rebutting the state court's factual findings "by clear and convincing evidence." *Burt*, 134 S. Ct. at 15; *see also Rice v. White*, 660 F.3d 242, 250 (6th Cir. 2011). This requirement mirrors the "presumption of correctness" AEDPA affords state-court factual determinations, which can be overcome only by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). The Supreme Court has cautioned, "'a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.'" *Burt*, 134 S. Ct. at 15 (quoting *Wood v. Allen*, 558 U.S. 290, 301 (2010)).

Indeed, the Supreme Court repeatedly has emphasized that § 2254(d), as amended by AEDPA, is an intentionally demanding standard, affording great deference to state-court adjudications of federal claims. The Court has admonished that a reviewing court may not "treat[] the reasonableness question as a test of its confidence in the result it would reach under de novo review," and that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington*, 562 U.S. at 102; *see also Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable - a substantially higher threshold."). Rather, § 2254(d) "reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems" and does not function

12

as a "substitute for ordinary error correction through appeal." *Harrington*, 562 U.S. at 102-03 (internal quotation marks omitted).   A petitioner, therefore, "must show that the state court's ruling . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id*. at 103. This is a very high standard, which the Court readily acknowledges:   "If this standard is difficult to meet, that is because it is meant to be." *Id.* at 102.

VI.   <span style="font-variant:small-caps">Analysis</span>

### A.     Grounds for Relief One and Two: Jury Instruction and Severance

Malone argues, in his first ground for relief, that the trial court erred by denying his jury instruction request on the reliability of informant testimony.   Malone's second ground for relief challenges the trial court's decision denying his request to sever his trial from his co-defendant's trial.  (R. 1-1 at 2-3.)   The Respondent asserts that neither ground is cognizable in federal habeas review "because those grounds involve a discretionary instructional question and separate trials where the state rule favors joint trials and hence do not state constitutional issues."   (R. 15 at 14).

To the extent that claims asserted in federal habeas petitions allege state-law violations, they are not cognizable on federal habeas review and should be dismissed on that basis.   "It is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.   In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 68 (1991) (citing 28 U.S.C. § 2241); *see also Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) ("[F]ederal habeas corpus relief does not lie for errors of state law."); *Engle v. Isaac*, 456

13

U.S. 107, 121 n.21 (1982) ("We have long recognized that a 'mere error of state law' is not a denial of due process.") (citation omitted)).

Moreover, "a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (citing *Estelle*, 502 U.S. at 67-68). A federal habeas court does not function as an additional state appellate court reviewing state courts' decisions on state law or procedure. *Allen v. Morris*, 845 F.2d 610, 614 (6th Cir. 1988).

State-court rulings on issues of state law may, however, "rise to the level of due process violations [if] they 'offend[] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quoting *Montana v. Egelhoff*, 518 U.S. 37, 43 (1996)). But they must be "so egregious that [they] result in a denial of fundamental fairness." *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). Fundamental fairness under the Due Process Clause is compromised where "the action complained of . . . violates those 'fundamental conceptions of justice which lie at the base of our civil and political institutions,' . . . and which define 'the community's sense of fair play and decency.'" *Dowling v. United States*, 493 U.S. 342, 353 (1990) (internal citations omitted). The Supreme Court, therefore, "ha[s] defined the category of infractions that violate 'fundamental fairness' very narrowly." *Id*. at 352.

### 1. Ground One: Jury Instruction

Malone's first ground for relief asserts the trial court erred by denying his jury instruction request. The requested instruction included:

You must consider some witnesses' testimony with more caution than others.   For example, paid informants, witnesses who have been promised immunity from prosecution, or witnesses who have received, or hope to gain, more favorable treatment in their own cases, may have a reason to make a false statement in order to strike a good bargain with the Government.

The testimony of such witnesses does not become inadmissible because of their moral turpitude or self-interest, but the benefits obtained by the witnesses may affect their credibility and makes their testimony subject to grave suspicion, and requires that it be weighed with great caution.

(R. 1-1 at 1-2.)   In addition to arguing that this claim is not cognizable, Respondent contends

that, even if cognizable, the claim would fail on the merits.   (R. 15 at 15-21.)

The state appellate court was the last state court to address this claim.   After explaining

Ohio law governing challenges to jury instructions, it stated:

{¶ 45} In his third assignment of error, Malone argues the trial court erred by failing to provide the jury with a cautionary instruction that the testimony of the two jailhouse informants, Smith and Young, "should be viewed with great suspicion and weighed with great caution" based on the "huge benefits" they received from the state in exchange for their testimony. The jury instruction requested by Malone is a modified version of Ohio Jury Instruction 409.17 which governs the testimony of an accomplice, not an informant.

{¶ 46} We recognize that both jailhouse informants were provided with reduced sentences in exchange for their testimony against Malone. However, Malone has provided this court with no case law to support his position that the general jury instruction given in cases involving accomplice testimony should be given where an informant provides testimony. See *State v. Jackson*, 2d Dist. Greene No.2009 CA 21, 2010−Ohio−1127, ¶ 15 ("Because the informant in this case was not charged with complicity * * *, the trial court did not err in failing to give the accomplice-witness instruction.").

{¶ 47} Moreover, "merely because a witness has received benefits or promises from the prosecution, such does not mean the testimony is not worthy of belief." *State v. Covington*, 10th Dist. Franklin No. 06AP-826, 2007−Ohio−5008, ¶ 8. Here, the jury was well aware of the informants' criminal histories and the benefits they received in exchange for their testimony. As instructed by the trial court, the jury was free to consider the informants' "interests and bias" when assessing their credibility. Because Malone cannot establish prejudice, and his proposed jury

15

instruction was not a proper statement of law, we find the trial court did not err by failing to give the requested accomplice instruction.

*Malone*, 2015 WL 3540457, at *9.

A state must prove every element of an offense in a criminal trial, and a jury instruction violates due process if it fails to meet that requirement.  *Middleton v. McNeil*, 541 U.S. 433, 437 (2004) (citing *Sandstrom v. Montana*, 442 U.S. 510, 520-21 (1979)).   But the Supreme Court has emphasized that "not every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation."  *Id*.  Indeed, "the circumstances that would induce a federal court to overturn the state court determination" regarding a requested jury instruction "would need to be extraordinary."  *Bagby v. Sowders*, 894 F.2d 792, 795 (6th Cir. 1990).

When presented with a jury-instruction claim, federal habeas courts must determine "'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process', not merely whether 'the instruction is undesirable, erroneous, or even universally condemned.'"  *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977) (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)).   "'[A] single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge.'"  *Boyde v. California*, 494 U.S. 370, 378 (1990) (quoting *Cupp*, 414 U.S. at 146-47).   If the instructions as a whole are ambiguous, the question is whether there is a "'reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution."  *Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (quoting *Boyde*, 494 U.S. at 380).

Here, the trial court's rejection of Malone's requested instruction did not violate his due process rights.   As the state appellate court noted, the jury was aware of the informants' criminal histories and the benefits they received for their testimony.   Also, the trial court instructed the jury to consider the informants' "interests and bias" when weighing their testimony.   Malone, therefore, has not demonstrated the "extraordinary" case in which the absence of his requested instruction "so infected the entire trial" that his conviction violated due process.   *Henderson*, 431 U.S. at 154.

Accordingly, the state appellate court's decision was not an unreasonable application of Supreme Court precedent, and this court recommends that Malone's first ground for relief be dismissed.

## 2.  **Ground for Relief Two: Severance**

Malone's second ground for relief challenges the trial court's decision denying his request to sever his trial from a co-defendant's.   (R. 1-1 at 2-3.)   Respondent argues this claim is not cognizable on federal habeas review because there is no underlying constitutional violation and, in addition, is meritless under the AEDPA standard of review.   (R. 15 at 21-26.)   The court agrees.

The state appellate court, the last state court to address this claim, reasoned:

{¶ 37} . . . In his fourth assignment of error, Malone argues he was denied his right to a fair trial and due process of law because the trial court joined his trial with Holloway's trial.

{¶ 38} It is well established that the law and public policy generally favor the joinder of charges and defendants, which involve the same acts, transactions, or course of criminal conduct. Crim.R. 8; *State v. Dunkins*, 10 Ohio App.3d 72, 460 N.E.2d 688 (9th Dist.1983). This court has stated that joinder of defendants and the avoidance of multiple trials is favored in the law because it "'conserves judicial and prosecutorial time, lessens the not inconsiderable expenses of multiple trials,

17

diminishes inconvenience to witnesses, and minimizes the possibility of incongruous results in successive trials before difficult juries.'" . . . Relief from such joinder is available under Crim. R. 14 upon a demonstration of prejudice by the defendant. ...

{¶ 39} In reviewing the record, we are unable to find that Malone has satisfied his burden of establishing prejudice. In rejecting a similar joinder argument in Holloway's direct appeal, this court stated:

> Malone's defense centered on inculpating Prude and Jemeal Evans ("Evans"), the individual Gamez thought was responsible for the murder. Evans is also known as "Mal" and was dating Stratford's ex-girlfriend at the time of the murder. Malone tried to inculpate Prude by pointing out his history of driving Malone's Chevy Impala. Malone tried to inculpate Evans by pointing out Gamez's allegations on the night of the murder, the prior relationship between Evans's girlfriend and Stratford, and Evans owning a car similar to the one used in Stratford's murder. Conversely, Holloway's defense focused on discrediting Prude, who identified Holloway in the surveillance video, and Young and Smith, Holloway's cellmates from the county jail who testified to Holloway confessing his involvement in Stratford's murder. At no point in trial did Holloway or Malone attempt to inculpate each other.

*Holloway*, 8th Dist. Cuyahoga No. 101289, 2015–Ohio–1015, at ¶ 24.

{¶ 40} Moreover, while Malone contends the informant testimonies of Young and Smith, standing alone, warranted separate trials, we note that the trial court went to great lengths to "pare down" the informants' testimonies to ensure Malone was not directly referenced. As mandated by the court, the informants' testimonies regarding their interaction and observations of Holloway while he was incarcerated were introduced solely for the purposes of proving Holloway's involvement in Stratford's murder. The trial court emphasized this point in a jury instruction, stating:

> Now, evidence may be admitted against one defendant even though it must not be considered as evidence by another defendant. You must carefully separate such evidence and consider only as to the defendant whom it applies. A statement by one defendant made outside the presence of another defendant is admissible as to the defendant making such statement and must not be considered for any purpose as evidence against any other defendant.

18

{¶ 41} Based on the nature of the informants' testimonies and the jury instructions provided by the trial court, Malone has failed to demonstrate any prejudice by the joint trial. Therefore, we find that the joinder was proper.

*Malone*, 2015 WL 3540457, at \*7-8 (citations omitted).

A trial court's refusal to grant a request for severance of a trial generally constitutes a matter of state law. *See, e.g., Hutchison v. Bell*, 303 F.3d 720, 731 (6th Cir. 2002). The Supreme Court has noted that "improper joinder of defendants does not, in itself, violate the Constitution. Rather, misjoinder would rise to the level of a constitutional violation only if it results in prejudice so great as to deny a defendant his . . . right to a fair trial." *United States v. Lane*, 474 U.S. 438, 446 n.8 (1986). Thus, "[i]n considering whether the denial of severance amounted to an error warranting relief in a habeas proceeding, the issue . . . is not whether the failure to sever . . . was a violation of a state rule of procedure, but whether the failure to sever denied the petitioner due process of law under the Fourteenth Amendment." *Davis v. Coyle*, 475 F.3d 761, 777 (6th Cir. 2007) (citing *Corbett v. Bordenkircher*, 615 F.2d 722, 724 (6th Cir.1980)).

"A petitioner seeking habeas relief on the basis of a trial court's failure to sever his trial from his co-defendant's bears a very heavy burden." *Standford v. Parker*, 266 F.3d 442, 459 (6th Cir. 2001) (citing *U.S. v. Horton*, 847 F.2d 313, 316 (6th Cir. 1998). "As a general rule, joint trials are favored." *Id.*; *see also Richardson v. Marsh*, 481 U.S. 200, 210 (1987) (observing that joint trials avoid inconsistent verdicts and enable a more accurate assessment of relative culpability). And habeas courts presume that jurors follow the trial court's instructions and give each defendant's case separate consideration. *Stanford*, 266 F.3d at 459 (citing *Francis v. Franklin*, 471 U.S. 307, 324 n.9 (1985)).

A habeas petitioner must demonstrate actual prejudice, not merely the potential for prejudice, in order to prevail on severance claims.   *Id.*   "A defendant is not entitled to severance merely because he might have had a better chance of acquittal in a separate trial," or because a co-defendant will present "antagonistic defenses."   *Standford*, 266 F.3d at 458 (citing *Zafiro v. United States*, 506 U.S. 534, 540 (1993), and *United States v. Day*, 789 F.2d 1217, 1224 (6th Cir. 1986) (holding that—absent some indication that the alleged antagonistic defendants misled or confused the jury—the mere fact that co-defendants blame each other does not compel severance)).   Instead, "[c]ourts should grant a severance 'only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.'"   *Id.* at 458-59 (quoting *Zafiro*, 506 U.S. at 539).   Moreover, granting or denying severance is within the trial judge's discretion, and a state trial court's alleged abuse of discretion, without more, is not a constitutional violation. *Id.* at 459.

Malone has not met the very heavy burden, as outlined by the above case law.   Here, as in state court, he presents only vague and conclusory assertions of prejudice, and no evidence to support a conclusion finding actual prejudice.   He focuses on the trial court's statement while discussing informant Smith's testimony that "[t]his should have been two trials.   We should have bifurcated this, to avoid this exact problem.   But regardless, pare [Smith's testimony] down and we'll go."   (R. 21-7 at 50-51.)   At most, this statement, without context, demonstrates the judge's belief at that moment that severance may have been a viable option for trial of the co-defendants' cases.   A review of the record, however, indicates that the judge and

20

counsel were discussing Smith's testimony and limiting it to remedy the concern for hearsay testimony and to remove reference to Malone.  *Id.; see also Malone*, 2015 WL 3540457, at *8. Further, the above passage does not show that joining the cases actually rendered Malone's trial so unfair as to violate his due process rights.   As the state appellate court determined and Respondent's brief echoes, Malone and Holloway did not have antagonistic defenses and the trial court appropriately limited Smith's testimony and instructed the jury to consider each defendant's case separately, which the jury is presumed to have followed.   (R. 15 at 25); *see also Malone*, 2015 WL 3540457, at *7-8 (citations omitted).

The court finds, therefore, that the state appellate court's decision neither contravened nor misapplied Supreme Court precedent and recommends that Malone's second ground for relief be dismissed.

### B.      Ground for Relief Three:   Sufficiency of the Evidence

In his third ground for relief, Malone claims his convictions were not supported by sufficient evidence.   (R. 1-1 at 3.)   Respondent argues this claim is meritless.   (R. 15 at 26-34.)

The state appellate court was the last state court to consider this claim, stating:

{¶ 26} In his first and second assignments of error, Malone argues his convictions are not supported by sufficient evidence and are against the manifest weight of the evidence. Because Malone's first and second assignments of error contain related arguments, we consider them together.

{¶ 27} When assessing a challenge of sufficiency of the evidence, a reviewing court examines the evidence admitted at trial and determines whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." Id. A reviewing court is not to assess "whether the state's evidence is to be believed, but whether, if believed, the evidence against a

21

defendant would support a conviction." *State v. Thompkins*, 78 Ohio St.3d 380, 390, 678 N.E.2d 541 (1997).

. . .

{¶ 29} "[T]he weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. DeHass,* 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. When examining witness credibility, "the choice between credible witnesses and their conflicting testimony rests solely with the finder of fact and an appellate court may not substitute its own judgment for that of the finder of fact." *State v. Awan*, 22 Ohio St.3d 120, 123, 489 N.E.2d 277 (1986). A factfinder is free to believe all, some, or none of the testimony of each witness appearing before it. *State v. Ellis*, 8th Dist. Cuyahoga No. 98538, 2013-Ohio-1184, ¶ 18.

{¶ 30} In challenging the sufficiency of the evidence, Malone does not raise arguments relating to any specific element of the offenses for which he was convicted. Instead, Malone collectively relies on the lack of physical evidence and the state's witnesses inability to identify him as the driver of the white Chevy Impala depicted in the surveillance video. Malone contends that without physical evidence or identification testimony, the jury improperly stacked inferences upon inferences and speculated that he was involved in Stratford's murder simply because he had a relationship with Holloway, who was identified as the shooter. We disagree.

{¶ 31} In our view, the state presented sufficient evidence to support Malone's convictions. Initially, we note that "[p]roof of guilt may be made by circumstantial evidence as well as by real evidence and direct or testimonial evidence, or any combination of these three classes of evidence." *Jenks*, 61 Ohio St.3d at 272, 574 N.E.2d 492. Thus, physical evidence is not required to sustain a criminal conviction. *State v. Lopez*, 8th Dist. Cuyahoga No. 94312, 2011-Ohio-182, ¶ 62.

{¶ 32} Here, the state presented ample evidence of Malone's motive to kill Stratford, the actions he undertook prior to Stratford's death, his presence at the scene of the crime, and his subsequent efforts to hide his involvement in Stratford's death by transferring the title of his Chevy Impala. Contrary to Malone's position, the state did not ask the jury to convict Malone simply because he was a friend of Holloway's.

{¶ 33} Specifically, the jury was presented with testimony that just days before Stratford was murdered, Malone was mugged by two assailants and believed Stratford was involved. While believing Stratford had just robbed and assaulted him, Malone immediately had Prude call Cousin in an effort to locate Stratford's whereabouts and set up a time to work on a song in the studio. Furthermore, while no witness was able to identify Malone in the surveillance video, there was

22

substantial evidence linking Malone to the scene of the crime, including (1) Lydston's testimony that Stratford gave a dying declaration that "Mal" was responsible for the shooting, (2) Lydston's testimony that she observed Stratford and Malone talking near a white Chevy Impala in the parking lot just hours before the shooting, (3) Cousin's testimony that he informed Stratford that Malone was looking for him and that Stratford stated, "that look like Mal. That is Mal. Let me go holler at him[,]" just before surveillance video depicts Stratford riding his bike over to a white Chevy Impala, (4) testimony that Malone's nickname was "Mal," (5) testimony that Malone routinely drove a white Chevy Impala that was registered under his name, and (6) testimony that a bullet hole was found in the driver's-side door of Malone's white Chevy Impala.[4]

{¶ 34} Based on the foregoing, we find that a reasonable trier of fact could find Malone guilty of all charges beyond a reasonable doubt. Accordingly, Malone's convictions were supported by sufficient evidence.

*Malone*, 2015 WL 3540457, at *5-7.

The Due Process Clause of the Fourteenth Amendment requires a state to prove every element of a crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 315‒16 (1979). A federal habeas court must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id*. at 319 (emphasis original). "[T]he *Jackson* inquiry does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a rational decision to convict or acquit." *Herrera v. Collins*, 506 U.S. 390, 402 (1993). In reviewing sufficiency claims, federal habeas courts "do not reweigh the evidence, re-evaluate the credibility of witnesses, or substitute [their] judgment for that of the jury." *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009).

---

4 The surveillance video shows that Holloway fired his gun in the direction of the driver's-side door.

Because both *Jackson* and AEDPA apply to Malone's sufficiency claim, federal habeas review requires deference at two levels.   "'First, deference should be given to the trier-of-fact's verdict, as contemplated by *Jackson*; second, deference should be given to the [state court's] consideration of the trier-of-fact's verdict, as dictated by [the] AEDPA.'"   *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (quoting *Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008)). The Sixth Circuit has explained:

> When reviewing whether the state court's determination was "objectively unreasonable," this court necessarily engages in a two-step analysis. First, we must ask whether the evidence itself was sufficient to convict under *Jackson*. The inquiry ends if the panel determines that there was sufficient evidence to convict [the petitioner]. If we find that the evidence is insufficient to convict, we must then apply AEDPA deference and ask whether the state court was "objectively unreasonable" in concluding that a rational trier of fact could find [the petitioner] guilty beyond a reasonable doubt.

*Stewart v. Wolfenbarger*, 595 F.3d 647, 653 (6th Cir. 2010).   The circuit court has observed that "'[a] defendant who challenges the sufficiency of the evidence to sustain his conviction faces a nearly insurmountable hurdle.'"   *Davis,* 658 F.3d at 534 (quoting *United States v. Oros*, 578 F.3d 703, 710 (7th Cir. 2009)).

Malone has not met this burden.   He repeats the argument here that he raised in the state appellate court: that because there was no evidence presented at trial that the car in the video belonged to him or that he drove that car to or from the scene of the offense, the jury relied only on "reasonable speculation" about his role in Stratford's murder rather than constitutionally sufficient evidence.   (R. 27 at 7.)   Malone cites several Sixth Circuit cases in which the court found the petitioner's aiding-and-abetting convictions were based upon reasonable speculation rather than sufficient evidence, including *Brown v. Palmer*, 441 F.3d 347 (6th Cir. 2006),

24

*Hopson v. Foltz*, 1987 WL 37432 (6th Cir. May 20, 1987), and *Fuller v. Anderson*, 662 F.2d 420 (6th Cir. 1981).    But those cases are readily distinguishable because each contained insufficient evidence demonstrating the petitioner's connection with the victim, perpetrator, and the crimes. In *Brown*, the evidence did not show that the petitioner had any prior relationship with the victim or the shooter, possessed a weapon or handed one to the gunman, or knew that the gunman was going to commit the crimes; he was merely present at the scene of the crime and had offered the shooter a ride the night in question.    *Brown*, 441 F.3d at 352-53.    In *Hopson*, there was no evidence that the petitioner acted in pre-concert with the perpetrator to commit the crime or did anything to assist him with the commission of the crime, although he was present at the shooting, may have argued with the victim the evening before the shooting, may have known that someone else intended to harm the victim, and may have taken the empty shell casings after the shooting. *Hopson*, 1987 WL 37432, at *2.    And in *Fuller*, the supporting evidence showed only that the petitioner was present at the scene of the crime and "looked around" while the crime was being committed.    *Fuller*, 662 F.2d at 424.

By contrast, in this case, as the state appellate court explained, "the state presented ample evidence of Malone's motive to kill Stratford, the actions he undertook prior to Stratford's death, his presence at the scene of the crime, and his subsequent efforts to hide his involvement in Stratford's death by transferring the title of his Chevy Impala." *Malone*, 2015 WL 3540457, at *6.    Malone does not dispute this evidence.    Moreover, as Malone concedes, circumstantial evidence is sufficient to support a conviction.    *See, e.g., Johnson v. Coyle*, 200 F.3d 987, 992 (6th Cir. 2000) ("Circumstantial evidence alone is sufficient to support a conviction, and it is not

necessary for the evidence to exclude every reasonable hypothesis except that of guilt.") (internal quotation marks and citations omitted).

Accordingly, the state appellate court's decision rejecting Malone's sufficiency claim is not contrary to, or an unreasonable application of clearly established federal law, and the court recommends that it be dismissed.

## VII.    CONCLUSION AND RECOMMENDATION

For the reasons stated above, the Court recommends that Petitioner Jamal Malone's petition for writ of habeas corpus (R. 1) be DISMISSED in its entirety, because the claims raised lack merit.

Date:   June 27, 2018                    *s/ David Ruiz*_____
                                         David A. Ruiz
                                         United States Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.    28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.    *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).